**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

CASE NO. 3:05-cr-6-J-32TEM

v.

TIMOTHY A. MILLIKEN

## REPORT AND RECOMMENDATION[1]

This matter comes before the Court following the government's request that Timothy A. Milliken ("Defendant") be involuntarily administered antipsychotic medication as part of his court-ordered treatment under 18 U.S.C. § 4241(d)(2)(A) so that he may be restored to competency for trial.  The Court recommends that the request be **GRANTED** as follows.[2]

## I. BACKGROUND

### A. Facts

On January 6, 2005, Defendant was indicted for three counts of violating 18 U.S.C. § 844(e) by using an instrument of interstate commerce (a cellular phone) to threaten to unlawfully destroy the DaimlerChrysler Services North America Deficiency Recovery Center in Jacksonville, Florida, by means of fire and explosives (Doc. #6).

---

[1]Any party may file and serve specific, written objections hereto within TEN (10) DAYS after service of this Report and Recommendation.  Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal.  *See* 28 U.S.C. §636(b)(1); Fed.R.Civ.P. 72(a), 6(a) and (e); Local Rules 6.02(a) and 4.20, United States District Court for the Middle District of Florida.

[2]The forced administration of antipsychotic drugs to an unwilling pretrial detainee is an issue with significant constitutional implications.  *Sell v. United States*, 539 U.S. 166 (2003); *see also Washington v. Harper*, 494 U.S. 210, 211 (1990).  Because of the  significant liberty interest at stake, the undersigned agrees with the reasoning of the Ninth Circuit in *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1070 (9th Cir. 2004) and finds that under the Federal Magistrate Act, 18 U.S.C. § 636, the filing of a Report and Recommendation to the District Court is the preferred method of proceeding if the magistrate judge has conducted evidentiary and testimonial hearings on whether a pretrial detainee should be forced to accept antipsychotic medication that is substantially likely to return him to a state of competence.

Defendant was also indicted for three counts of violating 18 U.S.C. § 875(b) by transmitting in interstate commerce a threat to injure the person of another (by way of shooting) with intent to extort money. *Id.* Defendant had a loaded firearm in his vehicle at the time of arrest. The maximum period of incarceration is 10 years for each of the threat counts and 20 years for each of the extortion counts, totaling 90 years plus $ 1.5 million in fines. 18 U.S.C. § 844(e) (2006); 18 U.S.C. § 875(b) (2006).

Based on comments made at bond hearings and other hearings in the case, the United States contends that Defendant's threats resulted from a long-standing dispute concerning the billing for an automobile he had purchased from Chrysler. The dispute arose over the company allegedly ignoring his directions on where his monthly bills should be sent. Defendant then claimed the contract was breached and refused to make further payments. The company contacted Defendant's brother and father in an effort to obtain payment, which the Defendant viewed as harassment.

According to the complaint filed against the Defendant, the father paid DaimlerChrysler about $17,700 for the vehicle in October 2004 (Doc. #1, ¶ 4.a). The Defendant believed the company's efforts to collect constituted extortion and complained to the Federal Bureau of Investigation and a local district attorney (Doc. #20 at 7-8). Beginning in November 2004, Defendant allegedly made telephone calls to employees at DaimlerChrysler, threatening to harm the company, place bombs in its facilities, and shoot persons who left the building (Doc. #1, ¶ 4).

Since being indicted and showing outward signs of mental illness, Defendant has been examined by five mental health professionals. The most recent four doctors have diagnosed Defendant with Delusional Disorder, Persecutorial Type (a mental defect listed

in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, at § 297.1).  Since

being hospitalized after the Court found Defendant incompetent, his treating doctors have

maintained that Defendant requires treatment with antipsychotic medication in order to be

rendered competent to stand trial (*see* Doc. #88, Attachment A; Doc. #87 Court Exhibit 1;

Doc. #99).

The Defendant was originally examined for competency on January 21, 2005, by

psychologist Dr. Alan J. Harris (Doc. #20).  The purpose of the two hour examination was

to determine: (1) Defendant's competency to stand trial; and (2) whether Defendant was

insane at the time of the offense charged.  *Id.*  Dr. Harris gave his opinion that the

Defendant was not suffering from a mental disease or defect rendering him incompetent.

Dr. Harris found a "mixed personality disorder with obsessive compulsive and narcissistic

traits."  *Id.* at 3-8.  Furthermore, Dr. Harris found that the Defendant was not insane at the

time of the offense charged and that he appreciated the wrongfulness of making bomb

threats.  *Id.* at 8.

Dr. Harris submitted his report dated January 24, 2005, which both parties stipulated

be accepted as to competency (Doc. #20).  An Order finding Defendant competent to

proceed at that time was entered (Doc. #22).  Approximately three months later, defense

counsel filed a notice of intent to pursue a defense of insanity at the time of the offense

(Doc. #35) and the United States requested that the Defendant be examined at a federal

facility under Title 18, U.S.C. §§ 4342 and 4247 (Doc. #36).

Defendant was then taken to the Bureau of Prisons Federal Correctional Institution

("BOP"), in Butner, North Carolina, where he was examined for two and a half months by

Dr. Kevin J. McBride, a forensic psychologist (Doc. #88, Attachment A).  Dr. McBride found

Defendant's delusional beliefs prominent, he wrote:

> Mr. Milliken's statements regarding the behaviors constituting the alleged offense strongly suggest the presence of a severe mental disease. There are clearly irrational components to his comprehension of the obligations incurred in the purchase of the vehicle. His statements that he could unilaterally dismiss the loan based on an administrative error in mailing statements is not reality-based. The actual payment of the loan by the father was voluntary, and an effort to assist the defendant in his financial concerns. The defendant misinterpreted this payment as extortion, and engaged in threatening behavior.

*Id.* Dr. McBride further opined that he believed Defendant's illness was present at the time of the offense. *Id.* at 9.

Defendant's originally appointed defense counsel subsequently moved to withdraw at his client's request (Doc. #47), but orally moved to withdraw the motion at a hearing (Docs. #49 and #50). The United States then moved, in October 2005, for a second competency examination (Doc. #51) based on Dr. McBride's and others' reports, and without objection by defense counsel.

The Court ordered that examination be done locally by psychologist, Dr. Jack M. Merwin (Doc. #58). Dr. Merwin met with the Defendant; however, the Defendant declined to participate in the examination (Doc. #61). The United States then moved to have Defendant sent to another federal facility for examination. At a hearing, defense counsel renewed his motion to withdraw at Defendant's request, which was granted (Doc. #64). At that time, Defendant stated he would cooperate in a local examination, to avoid being sent to a federal facility (Docs. #61 and #63).

New counsel was appointed (Doc. #64). Subsequently, the Defendant again declined to participate in the competency evaluation and the Court ordered him to the

4

Federal Detention Center ("FDC") in Miami, Florida, for further examination (Doc. #73).  An extension of time for the examination was later entered upon request of the institution (Doc. #75).  After the examining doctors from the FDC issued their reports, defense counsel moved to retain his own expert (Doc. #84), and his motion was granted (Doc. #85).

On March 17, 2006, the Court held a competency hearing.  The United States called the only witness, Dr. Jorge Luis, forensic psychologist from the FDC, Miami, Florida.  Dr. Luis testified that an essential feature of Defendant's disorder is the presence of one or more nonbizarre delusions that persist for at least a month (Doc. #87, Court Exhibit #1).  Dr. Luis found the "defendant demonstrates organized yet paranoid and delusional thinking.  He is highly suspicious of the motives of others and believes that others are involved in a vast conspiracy against him."  *Id.*  Notably, Dr. Luis found that Defendant has a significant impairment in the form of a "fixed false belief" that Chrysler Corporation has created a vast conspiracy against him, which now includes the government.  *Id.*

Dr. Luis concluded that although the Defendant has a basic factual understanding of the charges, "he demonstrated an impaired rational understanding of the proceedings against him and an impaired ability to meaningfully consult with counsel on his defense."  *Id.*

Defendant's brother has stated that Defendant has a "split personality" and that if someone pushes a hot button the Defendant will go into a rage (Doc. #88, Attachment A).  Defendant's father stated that his son was difficult to live with and that "he was always ranting about the government and the IRS."  *Id.*

Based upon the Court's finding that the Defendant was not competent to stand trial, Defendant was committed to the custody of the Attorney General under 18 U.S.C. § 4241.

5

Defendant is currently being held at the United States Medical Center of Federal Prisoners ("USMCFP") in Springfield, Missouri, and has been evaluated by psychologist Dr. Lea Ann Preston and  psychiatrist Dr. Robert G. Sarrazin.  (*See* Doc. #88 at 14; Doc. #91, Court Exhibit 1).  These current doctors have found that Defendant is not a danger to himself or others in the context of his confinement, but they have stated that he requires treatment with antipsychotic medication in order to restore his competency to stand trial (Doc. #91, Court Exhibit 1).  Defendant has refused to take such medication, maintaining that he is sound, and the doctors state that his refusal to accept treatment may result in "worsening mental illness." *Id.*

Since Defendant is not presently a danger to himself or others in the context of his confinement, a *Sell* hearing was necessary to decide whether the  Defendant could be involuntarily administered antipsychotic medication to restore his competency to stand trial. *Id.*  On June 12, 2006,  the Court conducted an involuntary medication hearing, at which Dr. Sarrazin and Dr. Preston testified.[3]

### B. Hearing

At Defendant's involuntary medication hearing, Dr. Sarrazin and Dr. Preston both testified that Defendant is currently incompetent to stand trial, that he suffers from Delusional Disorder, Persecutorial Type, and that it is possible he is bordering on Schizophrenia, Paranoid Type (Doc #99 at 13, 49, 56).  Both doctors testified that, in light of Defendant's medical condition, treatment with antipsychotic medications is medically

---

[3]A supplemental hearing concerning  procedural matters was held June 27, 2006, which the Defendant declined to attend.  No substantive questions concerning Defendant's medical condition were posed.

appropriate and alternative treatments would not be effective to restore him to competency. *Id.* at 15, 51. They further testified that treating Defendant with antipsychotic medication, whether voluntary or involuntary, would be substantially likely to render Defendant competent to stand trial (citing a Bureau Of Prisons 76 percent success rate). *Id.* at 22.

Both doctors testified as to the proposed treatment plan for the Defendant and described the types of drugs they would use. *Id.* at 18-27. They indicated that it was substantially likely medication could help render Defendant competent without side effects that would interfere with the fairness of Defendant's trial. *Id.* at 15, 50. They also reaffirmed their previous assessment that Defendant is not currently a danger to himself or others in the context of his confinement. *Id.* at 52. More specific details concerning the doctors' findings will be discussed in the analysis below.

## II. ANALYSIS

### A. The Legal Standard

The question presented is whether the Defendant, a mentally ill non-dangerous pre-trial detainee with Delusional Disorder, Persecutorial Type, can be involuntarily administered antipsychotic medication in order to render him competent to stand trial under the Supreme Court decision in *Sell v. United States*, 539 U.S. 166 (2003).

A prisoner has a constitutionally protected Fifth and Fourteenth Amendment liberty interest in remaining free from unwanted medical treatment and cannot be forced to accept medication without due process of law. *See Washington v. Harper*, 494 U.S. 210, 211 (1990) (recognizing "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs").

The Supreme Court, in *Sell*, however, held that a pre-trial detainee's liberty interest in remaining free from unwanted administration of antipsychotic drugs could be overcome provided the government shows: (1) *important* governmental interests are at stake, including the government's concomitant constitutional interest in assuring the defendant receives a fair trial; (2) involuntary medication will *significantly* further those concomitant interests; (3) involuntary medication is *necessary* to further those governmental interests; and (4) administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition.  *Sell*, 539 U.S. at 180-81.

### B. Preliminary Matters

For an appropriate analysis of the issue, three preliminary matters need to be addressed concerning: (1) a threshold inquiry; (2) administrative proceedings under the Code of Federal Regulations; and (3) the standard of proof.

### 1. Threshold Inquiry

The Supreme Court, in *Sell*, made it clear that a court seeking to require involuntary administration of antipsychotic drugs to a pre-trial detainee must first determine if forced medication can be warranted for reasons related to the individual's dangerousness as set forth in *Harper*.  *Sell*, 539 U.S. at 181-82.  Such factors include whether the defendant's refusal to take the prescribed medication will make him a danger to himself or others in the facility in which he is being confined.  *Harper*, 494 U.S. at 225.

The Supreme Court indicated a preference for a dangerousness inquiry prior to a competence inquiry since the dangerousness inquiry is more "objective and manageable" than one based entirely on the interest of the government rendering a defendant competent

to stand trial.  *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005) (quoting *Sell*, 539 U.S. at 182).

Since the prison doctors have testified that the Defendant is not currently a danger to himself or others in the institutional setting, the Court concludes an involuntary medication analysis must proceed under the *Sell* factors.  *See United States v. Gomes*, 387 F.3d 157, 160 (2nd Cir. 2004) (finding the *Sell* factors applied under circumstances extremely similar to the instant case).

### 2. Administrative Proceedings Under the Code of Federal Regulations

The Fifth Circuit recently held that before a *Sell* inquiry may proceed, the administrative procedures laid out in Title 28 Code of Federal Regulations Section 549.43 "Involuntary Psychiatric Treatment and Medication" must be exhausted.  *United States v. White*, 431 F.3d 431, 433-34 (5th Cir. 2005).

The Fifth Circuit appears to be the only circuit to have ruled that an administrative hearing (held within the prison facility) is required before a district court can order that a pre-trial detainee be involuntarily medicated.  The BOP, however, has taken the position that the decision in *Sell* invalidates administrative hearings (held solely for the purpose of restoring a pre-trial detainee's competency for trial) because the Supreme Court opinion implicitly requires that a court of law analyze the prisoner's medical condition and make the final decision as to whether the government's interest in ordering involuntarily medication outweighs the prisoner's constitutional liberty interest in remaining free from unwanted medical treatment.  *See United States v. Algere*, 396 F. Supp. 2d 734, 737 n.1 (E.D. La. 2005); *see also United States v. Barajas-Torres*, 2004 U.S. Dist. LEXIS 13232 (W.D. Tex. July 1, 2004).

28 C.F.R. § 549.43 is essentially the administrative codification of the due process standards, as set forth in *Harper*, that are required before medication may be involuntarily administered to a prisoner. The Supreme Court in *Harper* upheld the State of Washington's Department of Corrections Policy 600.30, which allowed prison doctors to involuntarily medicate prisoners, without a court order, if they posed a danger to themselves, others, or the property of another. *Harper*, 494 U.S. at 215. Because Policy 600.30 satisfied the requirements of due process by "providing for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses," the Supreme Court upheld its provisions. *Id.* at 235.

The legislative history of 28 C.F.R. § 549.43 explicitly states that the procedures it requires are a direct result of the *Harper* decision:

> The Bureau of Prisons is amending its regulations on Medical Services in order to define existing administrative safeguards in the provision of psychiatric treatment, including medication. [...] [T]he Supreme Court ruled in *State of Washington v. Harper* that absent a psychiatric emergency, psychotropic medications could be given on an involuntary basis to an involuntarily committed inmate only after certain administrative procedures were followed.

57 Fed. Reg. 53820 (Nov. 12, 1992) (codified at 28 C.F.R. § 549.43).

28 C.F.R. § 549.43 includes a provision that allows involuntary medication to be administered to a pre-trial detainee if an administrative hearing is held within the prison facility. 28 C.F.R. § 549.43(a)(5) (2006). Since *Harper* did not address the issue of administering involuntary medication to a non-dangerous pre-trial detainee in order to restore competence, the BOP maintains that after the *Sell* decision an administrative hearing concerning involuntary medication in order to restore competence is moot (Doc.

10

#103 at 5).  Dr. Sarrazin testified that pursuant to the decision in *White* the BOP only holds administrative hearings to involuntarily medicate a non-dangerous pre-trial detainee in order to restore competence within the Fifth Circuit.  *Id.*

It is the BOP's position that a *Sell* hearing supplants an administrative hearing concerning the question of whether to involuntarily medicate for the purpose of returning a prisoner to competency to stand trial.  *Id.*  In *Sell*, the defendant had an administrative hearing under 28 C.F.R. § 549.43, but he appealed the prison doctor's decision to involuntarily medicate him to the district court that was hearing his case since it was in the same district as the prison.[4]

The Court agrees with the BOP that, when the issue concerns a non-dangerous pre-trial detainee being restored to competency to stand trial, the decision in *Sell* makes an administrative hearing in the prison facility unnecessary.  An evidentiary hearing in a district court affords a defendant more due process protection than would an in-house administrative hearing at the prison facility.  In a court proceeding, the defendant will be able to have the assistance of his trial counsel and will be able to appeal a decision to involuntarily administer medication within the same circuit that is handling his or her case.[5]

---

[4] Justice Scalia and two other justices dissented in *Sell* based in part of the fact the defendant did not appeal the result of the prison administrative hearing under the Administrative Procedure Act, 5 U.S.C. § 702, but rather asked the district court for hearing on the appropriateness of the forced medication.  *Sell*, 539 U.S. at 188.  Although the district court had found part of the magistrate judge's order "clearly erroneous," it had affirmed the result, not indicating specifically on what basis the case was reviewed.

[5] In order to appeal an administrative decision under 28 C.F.R. § 549.43, the prisoner must appeal within 24 hours to the district court in which the facility is located pursuant to 5 U.S.C. § 702 (2006). This procedure would often involve a district court other than the one already handling a defendant's case. Although in *Sell* the prison hospital was within the district court's jurisdiction, the prison hospital in the instant case is not.  Furthermore, *Sell* has ruled that an appeal of a district court's order to involuntarily medicate a pre-trial detainee is an interlocutory appeal; therefore, the Defendant may appeal the Court's order directly to the Eleventh Circuit.  *See Sell*, 539 U.S. at 186.

In addition, two separate proceedings—one in prison and one in court—would unduly slow the process of the criminal case.

The Court will therefore proceed with a *Sell* analysis even though an administrative hearing pursuant to 28 C.F.R. § 549.43 has not been held in the instant case.

### 3. Standard of Proof

The Supreme Court did not qualify the standard of proof for determining the aforementioned *Sell* factors; however, several circuits have found that the relevant findings must be supported by *clear and convincing evidence*.  *See Gomes*, 387 F.3d at 160; *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005) (emphasis supplied).  This Court will use that standard.

### C. *Sell* Factors

### 1. Important Government Interest

The first prong of the *Sell* analysis involves the determination of an important governmental interest.  It is well established that the government has an important societal interest in bringing to justice a person accused of a serious crime against person or property.  *Id.* at 180.

The Fourth Circuit recently held:

> [I]t is appropriate to focus on the *maximum penalty* authorized by statute in determining if a crime is 'serious' for involuntary medication purposes.  Such an approach respects legislative judgments regarding the severity of the crime.

*United States v. Evans*, 404 F.3d 227, 237-38 (4th Cir. 2005) (holding a felony with a maximum term of imprisonment of 10 years is "serious" under any reasonable standard)

(emphasis added).

In the instant case, Defendant is charged with three counts of violating 18 U.S.C. § 844(e) and three counts of violating 18 U.S.C. § 875(b). These crimes involve threats to bomb a building occupied by numerous employees and threats to shoot certain individuals if they attempted to leave the building.  These crimes carry a maximum aggregate penalty of up to 90 years in prison and $ 1.5 million in fines, and are no doubt serious.

The Supreme Court noted in *Sell*, that the government's interest in prosecuting a defendant on serious charges can sometimes be mitigated under "special circumstances" such as a lengthy confinement that would diminish the risk of freeing the defendant without punishment *or*  the possibility that a lengthy confinement would constitute a significant credit toward any sentence ultimately imposed under 18 U.S.C. § 3585(b).  *Sell*, 539 U.S. at 180.

The Tenth Circuit has held that a nine month credit toward a possible fifty year prison sentence is insufficient to mitigate the government's interest in involuntary administering medication to restore competency to stand trial. *Bradley*, 417 F.3d at 1117. Moreover, the Fourth Circuit has held that a two year credit toward a 10 year term is insufficient to mitigate the government's interest. *Evans*, 404 F.3d at 239; *compare Rivera-Guerrero*, 426 F.3d at 1143 (holding a three year credit toward a possible two year sentence for a charge of illegal entry by a Mexican National under Title 8 U.S.C. § 1326 sufficient for mitigating the government's interest in involuntary administering medication), *and Barajas-Torres*, 2004 U.S. Dist. LEXIS 13232 at 11 (holding an eight month credit toward a possible six month prison sentence was sufficient to mitigate the government's interest).

13

In light of the aforementioned precedent and considering the amount of time the Defendant in the instant case faces (90 years), there appears to be *no* special circumstances for mitigation of the government's interest having antipsychotic medication administered to the Defendant in order to restore his competency for trial.

Defendant's defense counsel, however, argues that the government's interest in prosecuting Defendant is minimized because: (1) Defendant was not capable of carrying out threats to bomb a building since he was not in possession of any bomb materials at the time of his arrest; and, (2) if Defendant asserts an insanity defense and is subsequently found not guilty by reason of insanity, he will be civilly committed under 18 U.S.C. § 4246 and that this would militate against any governmental interest in prosecuting Defendant.

Although the Defendant was not arrested with bomb materials, he was arrested with a loaded firearm, and three of the six counts Defendant is charged with involve threats to shoot various individuals.  Therefore, there is evidence to suggest Defendant was, in fact, capable of carrying out at least some of the threats made at the time of their alleged making.  Those counts carry with them a maximum penalty of  20 years each, totaling a possible 60 year prison sentence.  So even assuming that Defendant's alleged bomb threats were disregarded, he would still be facing a maximum of 60 years.  This is *insufficient* to diminish the seriousness of Defendant's crimes or to mitigate the government's interest in prosecuting those crimes.

Defense counsel's second argument, which is based on the decision in *United States v. Morrison*, 415 F.3d 1180 (10th Cir. 2005), is that there is a substantial likelihood that the Defendant (if he were to proceed to trial) would be found not guilty by reason of insanity (Doc. #99 at 74-77).  Defense counsel posits that the Defendant would then be

14

civilly committed under 18 U.S.C. § 4243 and that this would undermine the government's interest in prosecuting the Defendant because it "could result in confinement beyond that permitted under criminal law...." *Id.* at 79.

The *Morrison* case, upon which defense counsel relies, is distinguishable, however, because the government in that case proceeded under a *Sell* analysis even though it argued the defendant was dangerous. *Morrison*, 415 F.3d at 1183. The *Morrison* court remanded the case, ordering the district court to proceed first under a *Harper* analysis or at least explain why it chose not to do so. *Id* at 1187. It further stated: "If involuntary medication is not appropriate under *Harper* [*i.e.*, for dangerousness], the district court may then reconsider whether an involuntary-medication order is appropriate under *Sell* [*i.e.*, for trial competency]." *Id.*

Here, it is well established that Defendant is not a danger (either to himself or others) in the context of his *present confinement*. Therefore, it is not appropriate to proceed under a *Harper* analysis at present.

Contrary to what defense counsel asserts, the Court cannot at this time find a "substantial likelihood" Defendant would be found not guilty by reason of insanity. The Defendant has asserted that he does not wish to assert such a defense. Furthermore, the argument that civil commitment could result in confinement beyond that permitted under criminal law does not sway the Court because Defendant faces up to 90 years in prison. Civil commitment under 18 U.S.C. § 4246 is indefinite. The only condition for discharge is that the patient's "release would no longer create a substantial risk of bodily injury to another person or serious damage to property...." 18 U.S.C. § 4246(e) (2006). Based on the fact the Defendant has been found to be non-dangerous in the context of his current

confinement, it is not clear whether he would at some point meet the criteria for civil commitment under 18 U.S.C. § 4246.  *See Evans*, 404 F.3d at 239.

Additionally, the government's interest in prosecuting Defendant has not been diminished by the possibility of civil commitment because "it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost."  *Gomes*, 387 F.3d 157 at 161 (*citing Sell*, 539 U.S. at 180).

In sum, under the facts of this case, there is *clear and convincing evidence* that, based on the seriousness of his offenses and the fact that Defendant has been determined as non-dangerous, the government's interest in prosecuting Defendant is sufficiently important enough to satisfy the first prong of the *Sell* test.

## 2. Significant Furtherance of the Government's Interest

In order for a court to determine that involuntary medication will significantly further the government's interest, it must find that involuntary administration of antipsychotic medication is: (1) *substantially likely* to render the defendant competent to stand trial; and (2) the drugs administered are *substantially unlikely* to have side effects that will interfere *significantly* with the defendant's ability to assist counsel and render the trial unfair.  *Sell*, 539 U.S. at 181(emphasis added).

### a. Substantially Likely to Render Defendant Competent

When determining whether involuntarily medicating a defendant is substantially likely to render him competent, it is required that there be a high probability of success in restoring the defendant to competence.  *See Gomes*, 387 F.3d at 159-61 (upholding the

16

district court's determination that a 70 percent probability of success is *substantially likely* to restore the defendant to competence) (emphasis added); *see also Bradley*, 417 F.3d at 1111 (holding a "reasonable expectation" to be sufficient).

The Second Circuit*,* in *Gomes*, found that the Bureau of Prisons has cited a 70 percent success rate in restoring defendants to competency through voluntary and involuntary treatments.  *Gomes*, 387 F.3d at 159-61.  It held that the cited 70 percent success rate is sufficient under the *Sell* test, even though that number was not entirely based on individuals with Delusional Disorder, Persecutory Type.  *Id.*  Furthermore,  the Tenth Circuit has held that a "reasonable expectation" a schizophrenic defendant could be restored to competency, following treatment with antipsychotic medications, was sufficient under a *Sell* analysis to have the medication be given involuntarily.  *Bradley*, 417 F.3d at 1111.

Involuntary administration of antipsychotic drugs was found less likely to succeed in *United States v. Ghane*, 392 F.3d 317, 320 (8th Cir. 2004), in which the magistrate judge made the following findings after considering testimony from at least four psychiatrists:

> Delusional disorder is characterized by the presence of one or more fixed, nonbizarre, and unvarying delusions.  Patients with delusional disorder do not experience hallucinations or disorders of thinking or perception.   Rather, they maintain delusions, or false beliefs, despite any amount of evidence to contradict those beliefs.  The delusions are 'nonbizarre,' meaning they involve events or situations that could conceivably occur in real life....   In the Persecutory Type of delusional disorder, individuals typically believe they are being conspired against....   The delusions are a fixed part of the individual's thought pattern, and, except in the mildest cases, they cannot be convinced through behavioral therapy to ignore the delusional beliefs or to recognize their falsity.  Antipsychotic medication is similarly ineffective at treating delusional disorder.  Approximately 10 percent of patients who receive

antipsychotic drugs experience a lessening of symptoms or remission.

*Id.* at 320 (holding a 10 percent chance of success the defendant would be restored to competence is *insufficient* to satisfy the *Sell* requirement that the medication be *substantially likely* to render the defendant competent to stand trial) (emphasis added).

At Defendant's involuntary medication hearing, Dr. Sarrazin and Dr. Preston both testified that the BOP currently has a 76 percent rate of success in restoring individuals to competence (Doc. #99 at 22, 63).   They further testified that they have both used involuntary medication to treat hundreds and perhaps thousands of patients and that they have each treated at least 50 patients diagnosed with Delusional Disorder.  *Id.* at 20, 63. They stated that they have enjoyed a similar 76 percent success rate with their respective patients.  *Id.*  Dr. Preston testified that she treated the defendant in *Gomes* and that, in her professional opinion, Mr. Gomes was restored to competency to stand trial.  *Id.* at 30.

Dr. Sarrazin testified that, even though delusions caused by Delusional Disorder are primary and may not go away, the goal of treatment with antipsychotic medications is "that the delusions become less problematic, less intrusive, less the sole focus of the individual's life...."  *Id.* at 21.  Dr. Sarrazin stated that individuals who are treated with antipsychotic medication are able to put aside their fixation on their delusions and realize that they need to proceed with their lives, which includes proceeding with their trials.  *Id.* at 22.

Based upon this testimony and the cited BOP success rate, the Court determines by *clear and convincing evidence* that there is a *substantial likelihood* Defendant can be restored to competence by being treated with antipsychotic medication.

### b. Substantially Unlikely to Have Interfering Side Effects

18

When determining whether the administration of medication is substantially unlikely to have side effects that may interfere with the defendant's ability to assist counsel, the type of drugs to be administered and their common side effects are crucial to the analysis.

There are two classifications of antipsychotic drugs that are commonly used: "typicals" and "atypicals." Typicals are older versions of drugs that can produce more severe side effects, such as muscle breakdown and involuntary movement of the face and tongue. *Gomes*, 387 F.3d 157 at 162. Atypicals are newer drugs that have milder side effects, such as sedation, dryness of the mouth, and constipation or diarrhea. *Id*.

The Supreme Court is concerned that drugs with serious side effects may impair a defendant's ability to assist counsel to such an extent that it renders the trial unfair. *See Rivera-Guerrero*, 426 F.3d at 1140. The Supreme Court considers a defendant's right to a fair trial a concomitant interest with the government's interest in prosecuting serious crimes. *Sell*, 539 U.S. 180-81. In order to survive the second prong of the *Sell* test, the drugs administered must have tolerable side effects that are *substantially unlikely* to interfere with Defendant's ability to assist counsel.

In the instant case, Dr. Sarrazin and Dr. Preston testified that they would begin Defendant's treatment with newer second generation atypical drugs such as "Abilify" or "Geoeon." *Id*. at 18, 32. They would begin with a dosage lower than the manufacturer's suggested dose and move upward until reaching an "effective dose." *Id*. at 31. The effective dose will be a specific dosage that has been determined to work well with the Defendant *as an individual* in light of side effects and effectiveness. *Id*.

Dr. Sarrazin testified that the newer generation medications generally have minimal nuisance side effects, which include nausea, dry mouth, constipation or diarrhea, and that

these tend to go away after several days or not occur at all.  *Id.* at 25.  Dr. Sarrazin further testified that extrapyramidal side effects such as muscle stiffness and the patient feeling like his legs have to keep moving are much less common with second generation drugs. *Id.* at 26.  He indicated that, if an order was issued allowing him to involuntarily treat the Defendant, his initial goal would be to sit down with the Defendant and discuss using oral second generation antipsychotic medications voluntarily.  *Id.* at 25.

If discussions with the Defendant did not work, he would then try second generation injectable medications. *Id.* at 27.  He noted, however, that these are only effective short-term so he would have to see if Defendant would continue the same medication, in oral form, voluntarily.  If Defendant refused, the doctor would then use a long-acting injectable first generation drug called "Haloperidol," which lasts for two to four weeks.  *Id.*  Even though first generation drugs such as Haloperidol tend to have more potential for side effects like sedation and extrapyramidal movements, Dr. Sarrazin stated that if Defendant experienced any of these side effects they would use a side effect medication named "Cogentin." *Id.* at 25-28.  This additional medication would reduce  those side effects and doctors at the facility would monitor Defendant closely to ensure his side effects were not serious.  *Id.*

If the prescribed medication appeared to cause Defendant immoderate sedation, Dr. Sarrazin said he would administer the medication at bedtime so the sedation would be slept off.  *Id.* at 28.  Dr. Sarrazin stated: "If there [were] problems with [the Defendant] becoming too sedated or not able to communicate further, that would not be the treatment we'd be looking for and we would, in fact, change medications."  *Id.* at 15.

Dr. Sarrazin testified that treatment with antipsychotic medication will actually

improve Defendant's ability to assist counsel.  He stated that psychiatrists "use these [antipsychotic ] medications to make individuals more responsive to their environment, more able to discuss things, more able to interact with others, such as the client/attorney interaction." *Id.* at 15.

Dr. Sarrazin also testified regarding possible side effects and the need for monitoring after  Defendant is transferred to a location (such as a county jail) to stand trial.  He stated that oftentimes, once a patient reaches a stable dosage and becomes competent, the patient realizes he needs to continue the medication.  *Id.* at 29.  Dr Sarrazin said that the types of medications he would prescribe could easily be provided in a county jail.  *Id.*

In conclusion, based on the testimony of Dr. Sarrazin and Dr. Preston, the Court finds by *clear and convincing evidence* that Defendant's planned treatment will significantly further the government's interests by being substantially likely to render the Defendant competent to stand trial and by being substantially unlikely to have side effects that will undermine the fairness of his trial.

This conclusion is based on testimony presented at the involuntary medication hearing that showed a specific treatment plan has been formulated for the Defendant as an individual.[6]  Dr. Sarrazin and Dr. Preston testified to the specific types of drugs they would use and their possible effect on the Defendant.  Their testimony was supported statistics and their conclusions were based on rational analysis.  The Defendant neither called a witness nor proffered any contradictory evidence.

---

[6] The Fourth Circuit in *Evans* held that BOP reports that proposed a generalized treatment plan without naming specific medications or taking the individual patient into consideration and which contained "little analysis explaining the rationale for its conclusions" was insufficient evidence that the medication was substantially likely to restore the defendant to competency.  *Evans*, 404 F.3d at 233.

### 3. Necessary to Further the Government's Interest

Before a court can order involuntary medication, the court must find it is necessary to further the government's interests.  In order to comport with this requirement, the court must: (1) find that less intrusive treatments are unlikely to achieve substantially the same results; and (2) the court must consider less intrusive means for administering the drugs (*e.g.*, a court order backed by contempt power) before considering forced administration. *Sell*, 539 U.S. at 181.

When considering these two requirements, the Second Circuit affirmed a decision that, based on psychiatrists' testimony, found less intrusive treatments (such as verbal therapy) would be ineffective because the defendant believed he was sound.  *Gomes*, 378 F.3d at 162.  That decision also found that:

> Gomes [the defendant] has repeatedly refused all chemical treatment and has indicated that he will not cooperate under any circumstances.  Since he seems to believe the judiciary has enlisted in the conspiracy against him, a court order does not seem to be the inducement he is waiting for.  In any event, Dr. Mrad and Sarrazin testified that Gomes would first be asked to take the medication voluntarily before it would be administered by force.

*Id* at 163.

The Tenth Circuit affirmed a decision that ordered a defendant to consult with counsel with "an eye toward voluntarily submitting to medication" and if he did not submit within 10 days the court would order involuntary administration. *Bradley*, 417 F.3d at 1112.

In the instant case, the Defendant adamantly refuses to take his recommended medication because he believes he is sound.  It also appears from the record that Defendant believes those treating him, as well as the Court, are involved in a conspiracy

22

against him.

When asked if alternative or less intrusive treatments would likely achieve the same result, Dr. Preston answered in the negative and stated:

> When someone has a psychotic disorder such as Mr. Milliken, unfortunately, educational groups, such as our competency restoration group, [are] not effective in addressing the underlying paranoia and delusional belief system.  Individual psychotherapy is also not effective.   [W]hen I attempt to communicate with Mr. Milliken, [the conversation] tends to very quickly become an argument, where anything that I say is perceived by him to either be a lie or a way to try to hurt him. So, unfortunately, individual psychotherapy would not be effective. The medically appropriate treatment that would alter his underlying delusional belief system would be antipsychotic medication.

Doc. #99 at 51-52.

The Defendant himself declined to answer the question posed to him by the Court concerning whether he would voluntarily take his prescribed medication if ordered to do so. *Id*. at 70.  The Defendant has stated he believes the Court and his doctors have engaged in a conspiracy against him.   *Id*. at 54.   He has declined the medication on a voluntary basis, therefore, it is highly unlikely he will voluntarily take his medication under pain of contempt.  In sum, the Court finds that involuntary medication is necessary because there appears to be no available alternatives for treatment  and no way to induce the Defendant to voluntarily take his medication.

### 4. Medically Appropriate in Light of Patient's Medical Circumstances

In order for the Supreme Court to consider forced administration of antipsychotic drugs medically appropriate, it must be in the patient's best medical interest in light of his condition. *Sell*, 539 U.S. at 181.  The Court noted that the "specific types of drugs matter

here as elsewhere." *Id.*

When determining medical appropriateness, the Fourth Circuit held that a court should first consider the patient's condition and how the proposed treatment will affect the patient *as an individual*, as opposed to how such treatment would affect patients in general. *Evans*, 404 F.3d at 241. The *Evans* court required that the government lay out  its proposed particular course of treatment and required it to describe the plan's probable side effects, how the doctors plan to deal with those side effects, how the benefits of the treatment plan outweigh the cost of the side effects and to set forth the criteria it will apply when deciding to discontinue the treatment.[7]  *Id.* at 242 (holding that the Butner staff's involuntary medication report was insufficient for determining medical appropriateness because it failed to explain how it reached its conclusions with respect to the patient as an individual).

The Second Circuit, however, credited the testimony of two psychiatrists who merely stated that the defendant's condition (Delusional Disorder, Persecutorial Type) "is such that he needs treatment with anti-psychotics."  *Gomes*, 387 F.3d at 163.

The court in *Gomes* stated:

> [The defendant] has adduced no evidence that the course of treatment would be detrimental given his medical condition, and we cannot say that the district court clearly erred in concluding that the administration of drugs is medically appropriate.

*Id.*; *see also Bradley*, 417 F.3d at 1115 (holding a psychiatrist's report that stated a

---

[7] Although the *Evans* court mentioned an additional factor, which was an estimate of how long the proposed treatment plan would take to restore the defendant's competence, the Court finds Dr. Sarrazin and Dr. Preston's incremental drug progression plan is sufficient to satisfy this additional factor.

schizophrenic pre-trial detainee would "substantially benefit" from treatment with antipsychotic medication was sufficient for medical appropriateness).

At Defendant's hearing, Dr. Sarrazin testified that the treatment of choice for individuals with psychotic disorders, such as Delusional Disorder, is antipsychotic medication (Doc. #99 at 15).  When asked if treating the Defendant would be medically appropriate, Dr. Preston answered in the affirmative and stated, "Psychotic disorders and their symptoms are distressful to the patient.  [...] It's also very clear from the literature that when someone has a psychotic disorder, the longer they go without treatment, the longer it often takes for medication to help them."  *Id.* at 58.

As discussed above, both Dr. Sarrazin and Dr. Preston have testified that treatment with antipsychotic medication is the medically appropriate treatment for the Defendant in light of his medical condition and, if not treated, Defendant's condition may worsen.  They have a developed plan to treat the Defendant as an individual.  This plan includes descriptions of the types of drugs to be used and their possible side-effects.  The plan also includes steps that will be taken, such as physicals and blood tests, to ensure Defendant does not suffer from intolerable side effects.  *Id.* at 26.  The Defendant presented no evidence to contradict the doctors.

The Court finds that the proposed treatment plan is specifically tailored for the Defendant, as an individual, and is substantially unlikely to have side effects that will interfere with his ability to assist counsel.  In fact, the evidence suggest that antipsychotic medication will help the Defendant assist his counsel by making his delusions less prominent.

The record indicates that Defendant suffers from a delusional disorder that four

25

mental health professionals have determined needs to be treated with antipsychotic medication.  The Court finds that the proposed treatment is medically appropriate in light of Defendant's medical condition.  The government has satisfied the fourth and final prong of the *Sell* analysis by *clear and convincing evidence*.

## III. CONCLUSION

Having considered all four *Sell* factors and Defendant's current incompetency to stand trial, the Court recommends that Defendant be involuntarily medicated with antipsychotic drugs.  The Court finds that the Defendant's need for treatment and the government's interest in having Defendant restored to competency are sufficiently important to overcome Defendant's constitutional liberty interest in refusing such treatment.

The Court recommends that Defendant be involuntarily administered antipsychotic drugs as follows. The Defendant shall remain the custody of the Bureau of Prisons for treatment to restore him to competence and may be involuntarily medicated if the Defendant does not voluntarily agree to receive the prescribed antipsychotic medication within ten (10) days of the date an order is issued by the District Court.  The prison is ordered to offer the medication voluntarily for ten (10) days before involuntarily administering the medication and to offer the Defendant the opportunity to take it voluntarily (if it is an oral medication) each time before involuntarily administering it.

After medications have initially been administered to the Defendant, a report shall be filed with the Court regarding the results of such treatments.  After the Bureau Of Prisons' doctors believe the medications have restored Defendant to competence, a report shall be filed with the Court regarding whether and how the medications will be continued at trial, how they would affect the Defendant at trial, and how to closely monitor the effects

of the medication throughout the trial.

The custodian of Defendant shall file these status reports with the Court.  Copies of the reports should be furnished to Ross Haine (counsel for Defendant), at 519 Newnan Street, Jacksonville, Florida 32202, and Ronald Henry, Assistant U. S. Attorney, at 300 N. Hogan Street, Suite 700, Jacksonville, Florida, 32202.  The first report should be submitted no later than forty five (45) days from Defendant's first receipt of the prescribed medication.

**DONE AND ENTERED** at Jacksonville, Florida this 12th day of July, 2006.

*Thomas E. Morris*

**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to:
The Hon. Timothy J. Corrigan
Asst. U. S. Attorney (Henry)
Ross S. Haine, II, Esq.
U. S. Marshal